UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES CLEMONS,

            Petitioner,                              Hon. Wendell A. Miles

v.                                            Case No. 1:06-CV-220

KENNETH McKEE,

            Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Clemons' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Clemons' petition be **denied**.

## BACKGROUND

As a result of events which occurred on December 22, 2000, Petitioner was charged with: (1) bank robbery, (2) conspiracy to commit bank robbery, (3) armed robbery, (4) conspiracy to commit armed robbery, (5) third degree fleeing and eluding, and (6) resisting and obstructing a police officer. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Darrell Redfield**

At approximately 5:05 p.m. on December 22, 2000, Redfield and his daughter, Shae Redfield, arrived at the TCF Bank in Marshall, Michigan.  (Trial Transcript, May 17, 2001, 34-35). Shae Redfield entered the bank while her father waited in the car.  (Tr. 35-37).  Shortly after his daughter entered the bank, Darrell Redfield observed two black males enter the bank wearing backpacks.  (Tr. 37-42).  Several minutes later, the two men exited the bank and quickly departed the area.  (Tr. 42-44).

At this point, Darrell Redfield, concerned about his daughter, attempted to enter the bank, but was unable to do so because the door was locked.  (Tr. 44-45).  Through a window, Redfield observed his daughter "standing behind the counter with the other bank tellers."  (Tr. 45). Shae Redfield gave her father "a thumbs up and waved for [him] to go after" the two black males. (Tr. 45-46).  Redfield saw a "light gold or tan colored" vehicle "about 80 yards away" which he followed after in his vehicle.  (Tr. 46).  Redfield soon encountered a police officer and informed him that the two men in the light gold or tan colored vehicle had just robbed the TCF Bank.  (Tr. 47-48).

**Shae Redfield**

On December 22, 2000, at "around" 5:00 p.m., Redfield arrived at the TCF Bank with her father.  (Trial Transcript, May 17, 2001, 12-14).  Redfield entered the bank and conducted her business, after which she "proceeded to exit the bank."  (Tr. 14-15).  As she was exiting the bank, Redfield encountered two black males.  (Tr. 15-17).  One of the men instructed Redfield to "come back into the bank."  (Tr. 17-18).  After entering the bank, the two men placed nylon masks over their faces.  (Tr. 18).  Redfield was able to observe the men, however, before they placed the masks

2

over their faces.  (Tr. 18-19).  Each man carried a bag and after entering the bank both men instructed the tellers to surrender the money from their drawers and place it in their bags.  (Tr. 24-26).  The tellers did as instructed after which the robbers exited the bank.  (Tr. 26-27).  Redfield identified Petitioner as one of the two bank robbers.  (Tr. 19-20).  Redfield also testified that Petitioner was carrying a weapon during the robbery.  (Tr. 22, 26).

**Barbara Cramer**

On December 22, 2000, Cramer was working as a teller at the TCF Bank.  (Trial Transcript, May 17, 2001, 49-51).  At approximately 5:00 p.m. that afternoon, Cramer observed two "dark complected" men prevent Shae Redfield from exiting the bank.  (Tr. 55-56).  The two men then entered the bank wearing masks.  (Tr. 55).  The men demanded that the tellers surrender all their money.  (Tr. 57).  They also instructed the tellers not to place any dye-packs in with the money.  (Tr. 57-58).  After collecting money from all the tellers, the two men exited the bank.  (Tr. 58-64).

Cramer testified that she maintained "bait money" in her cash drawer.  (Tr. 65).  She described bait money as a group of bills, wrapped together, from which the serial numbers have been recorded.  (Tr. 65).  Bait money is not given to customers, but is instead created specifically to be given to bank robbers.  (Tr. 65).  Cramer testified that she gave the bank robbers one packet of bait money.  (Tr. 65-66).  According to Cramer, the bait money in her drawer was marked with both the bank branch identification number as well as her teller identification number.  (Tr. 54-55).  Cramer testified that the bank's branch identification number was TCF-122.  (Tr. 54).  She also indicated that her teller identification number was 9359.  (Tr. 54).

3

**Brittany Syer**

On December 22, 2000, Syer was working as a teller at the TCF Bank.  (Trial Transcript, May 17, 2001, 78-80).  At approximately 5:00 p.m. that afternoon, Syer observed two masked men escort Shae Redfield back into the bank.  (Tr. 80-83).  The shorter of the two men instructed the tellers to surrender their money.  (Tr. 80-89).  The taller man then approached Syer and removed the money from her cash drawer.  (Tr. 87-89).  Syer testified that after the robbery she noticed that the bait money was no longer in her cash drawer.  (Tr. 91).  Syer testified that her teller identification number was 17687.  (Tr. 90).

**Cynthia Newland**

On December 22, 2000, Newland was working as a teller at the TCF Bank.  (Trial Transcript, May 17, 2001, 95-96).  At approximately 5:00 p.m. that afternoon, Newland observed that Shae Redfield was being "forced back" into the bank by two men wearing "black nylons over their faces."  (Tr. 96-98).  The two men each approached a different teller and began demanding money.  (Tr. 98-99).  Newland testified that one of the men was approximately six feet tall, whereas the other man was "a little bit shorter than that."  (Tr. 98-99).  The shorter man was carrying a gun.  (Tr. 101-03).  After collecting money from the tellers, the two men exited the bank.  (Tr. 98-105).  After the robbery, Newland observed that the bait money from her drawer had been taken during the robbery.  (Tr. 104).  Newland testified that her teller identification number was 12895.  (Tr. 104).

**Tanya Beers**

On December 22, 2000, Beers was working as a teller at the TCF Bank.  (Trial

Transcript, May 17, 2001, 116-17).  At approximately 5:00 p.m. that afternoon, two masked men entered the bank and demanded that the tellers surrender their money.  (Tr. 117-24).  Beers did as instructed, after which the men exited the bank.  (Tr. 117-24).  After the robbery, Beers observed that the bait money had been taken from her drawer.  (Tr. 121-22).  Beers testified that her teller identification number was 17737.  (Tr. 122).

**Joshua Lankerd**

As of December 22, 2000, Lankerd was employed as a Police Officer for the Marshall Police Department.  (Trial Transcript, May 17, 2001, 131-32).  On this particular day, Lankerd was working the 3:00 p.m. to 11:00 p.m. shift.  (Tr. 132).  Shortly after 5:00 p.m. that day, Lankerd was informed that the TCF Bank had just been robbed.  (Tr. 132).  As he was driving to the bank, a man "flagged" down Lankerd and informed him that he just witnessed two men "running from the bank." (Tr. 132-35).  The man further informed Lankerd that the two men departed in a brown or tan Intrepid.  (Tr. 135).  Lankerd attempted, without success, to locate the vehicle, after which he proceeded to the bank to speak with the bank employees. (Tr. 135-38).  Officer Lankerd later helped "process" an Intrepid.  (Tr. 139).  As part of this process, Lankerd discovered a "couple pairs" of rubber gloves, nylon stocking masks, and money.  (Tr. 139-42).

**Donald Mawer**

As of December 22, 2000, Mawer was employed as a Police Officer with the Marshall Police Department, working the 3:00 p.m. to 11:00 p.m. shift.  (Trial Transcript, May 17, 2001, 158).  At some point that afternoon, Officer Mawer was informed that the TCF Bank had been

robbed. (Tr. 159). Mawer proceeded to the bank to begin an investigation and to coordinate the efforts to locate the robbers. (Tr. 159-61). While he was at the bank, Officer Mawer was informed by Officer Lankerd that the suspects fled the area driving a gold Intrepid. (Tr. 161). At this point, Officer Mawer and Officer Lankerd began searching for this vehicle. (Tr. 161).

Shortly thereafter, Officer Mawer observed a gold Intrepid at a local gas station. (Tr. 161-65). Mawer observed that the vehicle's license plate was not visible. (Tr. 165). According to Officer Mawer, the car was "very clean" and "didn't appear to have any snow on the body at all." (Tr. 165). Nonetheless, it appeared that "somebody had taken snow and hand-packed it just on the license plate." (Tr. 165). From a distance of approximately 150 feet, Officer Mawer observed a black male, approximately six feet tall, pumping gas into the vehicle. (Tr. 166). Mawer observed a second individual sitting in the vehicle's passenger seat. (Tr. 166-67).

As soon as the man pumping gas spotted Officer Mawer (who was driving a marked police vehicle), he stopped pumping gas and departed the gas station at a "high rate of speed." (Tr. 167-69). Officer Mawer immediately called for back-up and then began "tracking behind the vehicle." (Tr. 169-70). Once assistance arrived, Officer Mawer activated his overhead lights and siren. (Tr. 170-71). In response, the vehicle did not stop and instead "accelerated from a speed of approximately 25 miles an hour to a speed well in excess of 70." (Tr. 171). After a brief chase, the driver of the Intrepid lost control of the vehicle and crashed. (Tr. 171-73). Two black males then exited the vehicle and attempted to flee. (Tr. 173). After a lengthy foot chase, Officer Mawer detained one of the men that exited the Intrepid. (Tr. 173-76). Officer Mawer identified the man he detained as Petitioner. (Tr. 176).

After placing Petitioner in a patrol car, Officer Mawer began to investigate the scene

6

of the automobile crash. (Tr. 177-78). At the crash scene, Mawer recovered a backpack. (Tr. 178-79). Inside the backpack, Mawer discovered $15,771.00 in "numerous denominations, bills, strapped with bank binding." (Tr. 180). At "least a dozen, if not two dozen" bank bands were recovered. (Tr. 180-81). Written on each band was the bank branch number and a teller identification number. (Tr. 181). The bank branch number written on every band was TCF 122. (Tr. 181). Each band also contained one of the following teller identification numbers: 17737, 17687, 9359, or 12895. (Tr. 181-82). Officers recovered an additional $1,255.00 from inside the vehicle. (Tr. 183-84). Subsequent investigation revealed that this vehicle was registered to Petitioner. (Tr. 195-96). Petitioner's accomplice was apprehended and identified as Larry Cavor. (Trial Transcript, May 18, 2001, 6, 31).

**Charles Clemons**

Petitioner testified that on December 22, 2000, he visited a friend (Michael Carter) in Kalamazoo where he first met Larry Cavor and another man named Leroy. (Trial Transcript, May 18, 2001, 21-22). Later that day, Petitioner, Cavor, and Leroy departed Carter's residence in Petitioner's vehicle. (Tr. 22-23). When they arrived in Marshall, Cavor instructed Petitioner to stop at a bank so that he and Leroy could cash their paychecks. (Tr. 23-24). Petitioner parked on the street while Cavor and Leroy entered the bank. (Tr. 24). A few minutes later, Cavor and Leroy returned to the vehicle, at which point Petitioner drove away. (Tr. 24-25). Petitioner asserted that he never discussed robbing the bank with Cavor or Leroy. (Tr. 24). Petitioner testified that he never saw any money in the vehicle and had no idea that Cavor and Leroy had robbed the bank. (Tr. 46, 61).

Petitioner stopped at a nearby gas station.  (Tr. 25).  Petitioner pumped the gas while Cavor remained in the vehicle.  (Tr. 25-26).  Leroy entered the gas station to pay for the gas.  (Tr. 25-26).  While he was pumping gas, Cavor told Petitioner, "let's go."  (Tr. 26).  When Petitioner "asked him about Leroy," Cavor responded, "fuck Leroy, let's leave now."  (Tr. 26).  Petitioner did as instructed. (Tr. 26).  Shortly after departing the gas station, Petitioner observed police cars behind him with their "red lights flashing."  (Tr. 26-28).  According to Petitioner, he attempted to stop his vehicle at which point Cavor brandished a weapon and told Petitioner, "smash the gas or you're dead."  (Tr. 27-28).  Petitioner did as he was instructed, even though he had no idea why he was being told to do so.  (Tr. 28, 59).

Petitioner acknowledged that on the day of the bank robbery it was cold.  (Tr. 35).  He also testified that when he arrived at the bank the parking lot was nearly empty.  (Tr. 34-35).  Petitioner acknowledged that despite these two facts rather than parking in the bank parking lot "close to the door of the bank," he parked on the street "around the corner."  (Tr. 35-36).

**James McDonagh**

As of December 22, 2000, McDonagh was employed as a Sergeant with the Calhoun County Sheriff's Department, working the 4:00 p.m. to midnight shift.  (Trial Transcript, May 18, 2001, 4).  As part of the investigation into the bank robbery, McDonagh investigated the gas station where Petitioner had been observed pumping gas.  (Tr. 6-7).  McDonagh uncovered no evidence that there was a third man with Petitioner and Larry Cavor that day.  (Tr. 7-8).  McDonagh further testified that the investigation revealed no evidence that there was a third man involved in the bank robbery.  (Tr. 7).

8

Following a jury trial, Petitioner was convicted of bank robbery, conspiracy to commit bank robbery, armed robbery, conspiracy to commit armed robbery, third degree fleeing and eluding, and resisting and obstructing a police officer. (Dkt. #20-24). Petitioner was sentenced - as an habitual offender - to serve the following concurrent periods of incarceration: (a) 28-50 years for armed robbery and conspiracy to commit armed robbery; (b) 140-480 months for bank robbery and conspiracy to commit bank robbery; (c) 60-90 months for fleeing and eluding; and (d) 24-36 months for resisting and obstructing. (Sentencing Transcript, June 18, 2001, 18). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.    The Double Jeopardy Clause of the federal and Michigan constitutions prohibits multiple punishments for the same offense. Defendant was convicted of armed robbery, bank robbery, conspiracy to commit armed robbery and conspiracy to commit bank robbery for the same criminal act. Therefore Defendant's convictions for bank robbery and conspiracy to commit bank robbery must be vacated because they amount to multiple punishments for the same offense.

II.   A preliminary examination is a pretrial confrontation. A pretrial confrontation can be impermissibly suggestive and therefore violate a defendant's due process rights. Looking at the totality of the circumstances, the identification of Defendant Clemons at the preliminary examination was impermissibly suggestive and without independent basis. Therefore Defendant's due process rights under the federal and Michigan constitutions were violated when the witness was allowed to identify Defendant at trial.

The Michigan Court of Appeals vacated Petitioner's convictions for bank robbery and conspiracy to commit bank robbery on double jeopardy grounds, but otherwise affirmed Petitioner's conviction. *People v. Clemons*, No. 235189, Opinion (Mich. Ct. App., June 24, 2003).

9

Asserting the following claims, Petitioner moved in the Michigan Supreme Court for leave to appeal:

I.        A preliminary examination is a pretrial confrontation. A pretrial confrontation can be impermissibly suggestive and therefore violate a defendant's due process rights. Looking at the totality of the circumstances, the identification of Defendant Clemons at the preliminary examination was impermissibly suggestive and without independent basis. Therefore Defendant's due process rights under the federal and Michigan constitutions were violated when the witness was allowed to identify Defendant at trial.

II.       The general armed robbery statute is limited and controlled by the bank robbery and conspiracy statutes. The Due Process Clause of the United States Constitution requires that the defendant must be charged and convicted under the correct statute defined with appropriate definiteness. The record clearly reveals the defendant was unarmed and intended to rob a bank, rather than the individuals therein. The crime committed by the defendant and defined by the Michigan legislature is bank robbery. The defendant stands convicted under the armed robbery statute, which amounts to a jurisdictional defect because the Michigan legislature intended the general armed robbery statute to be limited and controlled by the specific bank robbery and conspiracy statutes. Therefore, Defendant's conviction for armed robbery and conspiracy to commit armed robbery must be vacated because the circuit court never obtained proper jurisdiction over the defendant.

III.      The Due Process Clause of the federal and Michigan constitutions require that the prosecution must prove every essential element of a crime beyond a reasonable doubt. The prosecution failed to prove beyond a reasonable doubt every essential element of armed robbery and conspiracy to commit armed robbery. Therefore, Defendant's convictions for

10

armed robbery and conspiracy to commit armed robbery must be vacated because the prosecution failed to prove every essential element beyond a reasonable doubt.

IV.     In accordance with Michigan law, the prosecution must file a notice of sentence enhancement within 21 days of a defendant's arraignment on the underlying charges.  The prosecution violated the 21 day time limit to file sentence enhancement procedures.  Therefore, the defendant's convictions as a habitual offender must be vacated because the circuit court was without jurisdiction to convict and sentence the defendant as a habitual offender.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court."  *People v. Clemons*, No. 124306, Order (Mich., Dec. 30, 2003).

Petitioner subsequently filed in the trial court a motion for relief from judgment, which was denied on August 19, 2004.[1]  *People v. Clemons*, No. 01-71-FC, Order (Calhoun County Cir. Ct., Aug. 19, 2004).  Petitioner then moved in the Michigan Court of Appeals for leave to appeal, asserting the following claims:

I.      Defendant was deprived of due process and fundamental fairness of the law under both the state and federal constitutions when:

(a)     the prosecutor was allowed to amend the charges against Defendant to add new charges of armed robbery and conspiracy to commit armed robbery at the preliminary exam, which he knew the defendant had not been properly bound over on, thus, seeking to charge Defendant with offenses in

---

[1]   It is not clear from the record what issues Petitioner asserted in this motion.

11

which punishment was more severe after knowing that he had charged Defendant with the proper offense of bank robbery;

(b)    Defendant was deprived of his statutory right to receive a preliminary examination on the new and amended charges of armed robbery, thus depriving the trial court of its jurisdiction to try Defendant on the new and amended charges without first requiring that Defendant have a preliminary examination and proper bind over on those amended charges; and

(c)    the prosecutor presented insufficient evidence at the preliminary exam and trial to support Defendant's bind over and convictions for the crimes of armed robbery and conspiracy to commit armed robbery.

II.    Defendant was deprived of due process, equal protection and fundamental fairness of the law, when the prosecution failed to timely file the sentence enhancement information with the circuit court clerk within the 21-day mandate by MCLA 769.13, thus depriving the circuit court of its jurisdiction to impose a sentence on Defendant under the sentence enhancement provision of MCLA 769.10

III.    Defendant was deprived of due process, equal protection and fundamental fairness of the law, when he was charged with, put on trial for, convicted of, and sentenced for the crimes of conspiracy to commit bank robbery and armed robbery, without first having the prosecution note those specific offenses in the felony information filed with the circuit court clerk, thereby depriving this court of its jurisdiction to proceed against Defendant on the charges.

IV.    Defendant was denied his constitutional rights to the

12

effective assistance of counsel when:

(a)     defense counsel failed to timely file with the circuit court a motion to remand the case back to the district court for a preliminary exam and proper bind over on the new and amended charges of armed robbery and conspiracy to commit the offense of armed robbery;

(b)     defense counsel failed to timely file with the circuit court a motion to quash the information charging Defendant with the new and amended charges of armed robbery and conspiracy to commit the offense of armed robbery, where the evidence introduced at the preliminary exam fails to establish that Defendant committed the specific offenses of armed robbery and conspiracy to commit armed robbery against prosecution witness Ms. Barbara Cramer;

(c)     defense counsel failed to timely file with the circuit court a motion to quash the felony information charging Defendant with the specific offense of conspiracy to commit the crime of armed robbery, where the information fails to cite the statutory authority for that offense or the language which gives rise to that offense; and

(d)     defense counsel failed to timely file with the circuit court a motion to quash the prosecutor's untimely felony information to seek sentence enhancement.

V.     Defendant was denied his constitutional rights to the effective assistance of appellate counsel when

13

appellate counsel failed to read and master the trial records, and thus, failed to raise four dead-bang winner claims during Defendant's first appeal of right, thereby depriving Defendant of his constitutional rights to a meaningful and effective first appeal from his convictions.

The Michigan Court of Appeals denied Petitioner's request "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Clemons*, No. 259309, Order (Mich. Ct. App., June 24, 2005).  Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal.  The court denied Petitioner's request because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Clemons*, No. 129147, Order (Mich., Nov. 29, 2005).  On March 31, 2006, Clemons initiated the present action and subsequently amended his petition to assert the following claims:

I.      A preliminary examination is a pretrial confrontation. A pretrial confrontation can be impermissibly suggestive and therefore violate a defendant's due process rights.   Looking at the totality of the circumstances, the identification of Defendant Clemons at the preliminary examination was impermissibly suggestive and without independent basis.   Therefore Defendant's due process rights under the federal and Michigan constitutions were violated when the witness was allowed to identify Defendant at trial.

II.     Defendant was deprived of due process and fundamental fairness of the law under both the state and federal constitutions when:

(a)     the prosecutor was allowed to amend the charges against Defendant to add new charges of armed robbery and conspiracy to commit armed robbery at the preliminary exam, which he knew the defendant had not been properly bound over on, thus, seeking

14

to charge Defendant with offenses in which punishment was more severe after knowing that he had charged Defendant with the proper offense of bank robbery;

(b)    Defendant was deprived of his statutory right to receive a preliminary examination on the new and amended charges of armed robbery, thus depriving the trial court of its jurisdiction to try Defendant on the new and amended charges without first requiring that Defendant have a preliminary examination and proper bind over on those amended charges; and

(c)    the prosecutor presented insufficient evidence at the preliminary exam and trial to support Defendant's bind over and convictions for the crimes of armed robbery and conspiracy to commit armed robbery.

## **STANDARD OF REVIEW**

Clemons' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

15

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at

16

411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

I.        **Identification Claim**

As noted above, at Petitioner's trial, Shae Redfield identified Petitioner as one of the two men who robbed the TCF Bank on December 22, 2000.  Redfield first identified Petitioner at his preliminary examination.  Petitioner asserts that because Redfield's initial identification of him was "impermissibly suggestive and without independent basis" the admission at trial of her identification testimony violated his constitutional right to due process of law.

It has long been accepted that "[t]he admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'"  *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) and citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)).  To determine whether the admission of identification testimony constitutes a due process violation, a court must undertake a two-step inquiry.  *Haliym*, 492 F.3d at 704.  It must first be determined whether the identification was "unnecessarily suggestive."  *Id.*  If such is the case, the court must consider "whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure."  *Id.*

Determining whether an identification procedure is unnecessarily suggestive "depends upon whether the witness's attention was directed to a suspect because of police conduct." *Id.*  If the identification procedure is found to be unnecessarily suggestive, the court must determine "whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification."  *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)).  The

18

Supreme Court has instructed that a court must consider the following factors to determine whether a suggestive identification is nonetheless reliable: (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification. *Haliym*, 492 F.3d at 704 (citing *Manson*, 432 U.S. at 114 and *Neil*, 409 U.S. at 199-200).

Even assuming that it was unnecessarily suggestive for Shae Redfield to initially identify Petitioner at his preliminary examination, the totality of circumstances does not support Petitioner's argument that Redfield's identification of him was unreliable.  At the preliminary examination (just as at trial), Redfield testified that she was able to "see the faces" of the two men who forced her back into the bank on the day of the robbery.  (Preliminary Examination Transcript, Jan. 3, 2001, 9-13).  While Redfield was able to view Petitioner's face for only a brief period of time, she was able to clearly view his face from very close range.  (Tr. 9-13).

With respect to the second factor, the reliability of an identification is increased where the witness "was able to view the assailant with a heightened degree of attention, as compared with disinterested bystanders or casual observers." *Haliym*, 492 F.3d at 705.  Redfield was certainly not a disinterested bystander or casual observer, but was instead directed at gunpoint (at point-blank range) to re-enter the bank so that Petitioner and Larry Cavor could commit robbery.  (Tr. 13-23).

The third factor does not appear to be relevant because there is no evidence in the record that Redfield provided police with a description of the bank robbers or had previously participated in any type of identification procedure.  As for the level of certainty Redfield exhibited regarding her identification, the Court notes that her identification of Petitioner was unequivocal and

19

without hesitation.  Finally, only twelve days transpired between the bank robbery and the preliminary examination.  *See Howard v. Bouchard*, 405 F.3d 459, 473-74 (6th Cir. 2005) (observing that "three months is not a great length of time between an observation and identification").

The Michigan Court of Appeals determined that the admission at trial of Shae Redfield's identification testimony did not violate Petitioner's due process rights.  *People v. Clemons*, No. 235189, Opinion at 2-3 (Mich. Ct. App., June 24, 2003).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.


**II.          Procedurally Defaulted Claims**

Petitioner has procedurally defaulted his remaining claims.  Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is

applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004).

It must be remembered, however, that for the procedural default doctrine to apply, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). Furthermore, review by a state court of a procedurally defaulted claim to prevent manifest injustice does not constitute a review on the merits sufficient to excuse procedural default. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006). To establish that a miscarriage of justice would result from the failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991). To satisfy this requirement Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error "probably resulted" in the conviction of an innocent

21

person.  *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995).  The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Id.* at 326-27.

Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal.  M.C.R. 6.508(D)(2)-(3).  With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom.  M.C.R. 6.508(D)(3).  In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default.  *See Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002).  Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues against which it is applied.  *Simpson*, 238 F.3d at 407.

In his remaining claims, Petitioner asserts that his due process rights were violated by the following: (1) the prosecutor was allowed to amend (at the preliminary examination) the charges against Petitioner; (2) Petitioner was deprived of his statutory right to have a preliminary examination of these new and amended charges; and (3) the prosecution failed to submit sufficient evidence to support his conviction for armed robbery and conspiracy to commit armed robbery.

Petitioner did not properly assert these claims in his direct appeal as of right.[2]  He did, however, present these claims in his post-conviction motions for relief.  As previously noted, Petitioner's motion for relief from judgment was denied by the Michigan Supreme Court on the ground that Petitioner failed to comply with Michigan Court Rule 6.508(D).  Petitioner has, therefore, procedurally defaulted these particular claims.

Petitioner has failed to establish that good cause exists for his failure to properly raise these issues on his direct appeal as of right.  However, even if the Court assumes that Petitioner can demonstrate good cause, he is still not entitled to relief because he cannot establish that he will suffer prejudice or that a fundamental miscarriage of justice will result from the Court's failure to consider these claims, as they are without merit.

Petitioner was initially charged with bank robbery, third degree fleeing and eluding, and resisting and obstructing a police officer.  At the preliminary examination, the prosecution moved to amend the charges against Petitioner to also include: armed robbery, conspiracy to commit armed robbery, and conspiracy to commit bank robbery.  After hearing the evidence presented at the preliminary examination, the state court found that there existed sufficient evidence to bind Plaintiff over for trial on all six charges.  (Preliminary Examination Transcript, Jan. 3, 2001, 97-109).  On January 23, 2001, the prosecution issued an amended felony information identifying the three additional charges with which Petitioner was being charged.  (Dkt. #29).  On January 29, 2001,

---

[2]  Petitioner did assert - in his direct appeal to the Michigan Supreme Court - his claim that the prosecution failed to introduce sufficient evidence to support his convictions for armed robbery and conspiracy to commit armed robbery.  However, Petitioner did not first assert this particular claim to the Michigan Court of Appeals.  The Sixth Circuit has held that the exhaustion requirement is not satisfied where a petitioner first  presents a claim on discretionary appeal to the state's highest court, unless that court opts to review the merits of the claim.  *See Hall v. Huffman*, 2000 WL 1562821 at *3 (6th Cir., Oct. 11, 2000) (applying *Castille v. Peoples*, 489 U.S. 346 (1989)); *Dunbar v. Pitcher*, 2000 WL 179026 at *1 (6th Cir., Feb. 9, 2000) (same).  On direct appeal, the Michigan Supreme Court denied Petitioner's request for leave to appeal.  Thus, Petitioner failed to properly present this claim on direct appeal.

Petitioner was arraigned and notified that he was being charged with the six offenses identified above.  (Dkt. #18).

Petitioner asserts that he is entitled to habeas relief because: (1) the prosecutor improperly amended the charges against him at the preliminary examination; (2) he was deprived of his statutory right to receive a preliminary examination on charges of armed robbery, conspiracy to commit armed robbery, and conspiracy to commit bank robbery; and (3) the prosecution failed to present sufficient evidence to support Petitioner's convictions for armed robbery and conspiracy to commit armed robbery.

The Due Process Clause of the Fourteenth Amendment affords to every criminal defendant the "right to notice of the charges against him."  *Browning v. Foltz*, 837 F.2d 276, 280 (6th Cir. 1988) (citing *Cole v. Arkansas*, 333 U.S. 196, 201 (1948)).  Accordingly, a "conviction upon a charge not made" constitutes a denial of due process.  *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) (citations omitted).  However, while a criminal defendant has a constitutional right to notice of the charges against him, alleged deficiencies in the state's initial criminal proceedings are not cognizable in a federal habeas corpus proceeding, because such deficiencies do not undermine the validity of the subsequent conviction at trial.  *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975), *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002); *Mattox v. Davis*, 2005 WL 2656610 at *2 (W.D. Mich., Oct. 18, 2005) (collecting cases).  Petitioner was given ample notice of the charges against him at both the preliminary examination and subsequent arraignment.  To the extent that Petitioner alleges that the manner by which the prosecution initiated these charges failed to comply with Michigan law, such is not cognizable in a federal habeas proceeding.  Thus, these two claims are without merit.

Finally, Petitioner's claim that the prosecution failed to present sufficient evidence to support his convictions for armed robbery and conspiracy to commit armed robbery are likewise without merit.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).  Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law in effect as of the date Petitioner committed the acts for which he was convicted, the elements of armed robbery were: (1) an assault; (2) a felonious taking of property from the victim's person or presence; and (3) the defendant must be armed with a weapon described in the statute.  *People v. Johnson*, 547 N.W.2d 65, 71 (Mich. Ct. App. 1996).  Pursuant to the relevant statute, this last element is satisfied where the defendant was "armed with a dangerous weapon, or any article used or fashioned in a manner to lead the person so assaulted to reasonably believe it to be a dangerous weapon."  Mich. Comp. Laws § 750.529 (1997); *see also, People v. Harris*, 1997 WL 33487029 at *1 (Mich. Ct. App., July 18, 1997) ("a dangerous weapon within the meaning of the statute includes 'an article which is in fact a dangerous weapon - a gun,. . .etc. or some article harmless in itself, but used or fashioned in a manner to induce the reasonable

belief that the article is a dangerous weapon'").

Because armed robbery is a specific intent crime, the prosecution "must establish that the defendant intended to permanently deprive the owner of the property." *People v. King*, 534 N.W.2d 534, 536 (Mich. Ct. App. 1995). As Michigan courts recognized, "[c]ircumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of a crime" and, furthermore, "[s]pecific intent may be inferred from circumstantial evidence." *Harris*, 1997 WL 33487029 at *2.

As the judge conducting the preliminary examination noted, the prosecution charged Petitioner with armed robbery under an aiding and abetting theory. To convict an individual as an aider and abetter the following elements must be established: (1) the underlying crime was committed by either the defendant or some other person, (2) the defendant performed acts or gave encouragement which aided and assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid or encouragement. *See People v. Bates*, 2000 WL 33421465 at *1 (Mich. Ct. App., April 28, 2000) (citing *People v. Turner*, 540 N.W.2d 728 (Mich. Ct. App. 1995)).

Finally, as defined by Michigan law in effect at the time of Petitioner's trial, the elements of the crime of conspiracy are "a mutual understanding or agreement between two or more persons, express or implied, to do or accomplish some criminal or unlawful act or to accomplish some lawful act or purpose not in itself criminal but by criminal or unlawful means." *People v. Bageris*, 288 N.W.2d 439, 441 (Mich. App. 1979) (citations omitted).

Viewing the evidence detailed above in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could

certainly have found Petitioner guilty beyond a reasonable doubt of armed robbery and conspiracy to commit armed robbery.  This claim, therefore, is without merit.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Clemons' petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  November 4, 2008                      /s/ Ellen S. Carmody
                                                            ELLEN S. CARMODY
                                                            United States Magistrate Judge